Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT

 2   FOR THE DISTRICT OF CONNECTICUT

 3   -------------------------------x

 4   EVELINE GOINS,

 5                 Plaintiff,

 6       -versus-                    : Case No. 3:02CV 1069
                                       (MRK)

 7

     JBC & ASSOCIATES, ET AL,

 8

                 Defendants.

 9

     -------------------------------x

10

11

12

13             Deposition of JACK H. BOYAJIAN, taken

14   pursuant to The Federal Rules of Civil Procedure, at the

15   offices of Sanders, Gale & Russell, 437 Orange Street,

16   New Haven, Connecticut, before Patricia Saya, LSR No.

17   37, a Registered Professional Reporter and Notary Public

18   in and for the State of Connecticut, on January 27,

19   2004, at 10:35 a.m.

20

21

22

23

24

25
```

GOINS v. JBC

January 27, 2004

Page 8

1      Q.    You were associated with G&L Financial?

2      A.    I don't know what you are referring to.  Can

3   you explain exactly what you mean by "associated"?

4      Q.    When did you graduate from Rutgers?

5      A.    Rutgers what, ma'am?

6      Q.    Law School?

7      A.    1996.

8      Q.    And did you take the New Jersey Bar?

9      A.    Yes, I did.

10     Q.    And did you pass it?

11     A.    Yes, I did.

12     Q.    And did you get admitted to New Jersey?

13     A.    No, I did not.  I did not apply for

14   New Jersey -- I did apply, but I withdraw my application

15   for admission to the bar.

16     Q.    Why was that?

17     A.    I chose not to be admitted in New Jersey.

18     Q.    Are you admitted anyplace else?

19     A.    Yes.

20     Q.    Where is that?

21     A.    California.

22     Q.    That was what year?

23     A.    1999.

24     Q.    Do you practice law in California?

25     A.    Yes, I do.

SANDERS, GALE & RUSSELL

(203) 624-4157

GOINS v. JBC                                                 January 27, 2004

Page 25

1    not seeing the link at all.

2        Q.    Are you a debt collector, Mr. Boyajian?

3        A.    I believe that that requires a conclusion of

4    law, and I don't know how to answer that question.

5        Q.    Do you directly or indirectly engage in

6    collection of debts?

7        A.    I am an attorney at law that provides services

8    to clients who have debts that are with consumers that I

9    am engaged in recovering for.

10       Q.    Do you do that type of work in connection with

11   JBC & Associates?

12       A.    PC?

13       Q.    PC?

14       A.    Yes.

15       Q.    Do you do that type of work for any other

16   entity?

17       A.    I am not sure I understand that question.

18   That is the law firm which I work in as an attorney, so

19   I don't think -- I think the answer would be no.  I am

20   not sure what you are asking me.  Am I employed as an

21   attorney with other firms?

22       Q.    Yes.

23       A.    No.

24       Q.    When you do lawsuit -- let me ask you, do you

25   do lawsuits on behalf of the clients of JBC, PC?

GOINS v. JBC                                    January 27, 2004

Page 29

1    least twice.

2        Q.    The ones you applied was several years ago?

3    Was that your testimony?

4        A.    I believe it was in 2002.

5        Q.    So in 2002, you submitted an application to

6    the Banking Department, and it has not been granted?

7        A.    Correct.

8        Q.    Did you submit an application in 2003?

9        A.    Asked and answered.

10       Q.    That is a "yes" or "no."

11       A.    My application was outstanding in 2003.  I

12   didn't have to reapply.  I told you, I applied once, and

13   we were requested for documentation and information, and

14   we responded.

15       Q.    Have you been in communication with the

16   Banking Department since your application?

17       A.    Members of my staff have been, yes.

18       Q.    Who is in charge of that?

19       A.    Marv Brandon.

20       Q.    So Marv Brandon is the one that would know

21   about the Banking Department licensing application?

22       A.    That would be my assumption, because he is

23   responsible for it.

24       Q.    When you applied in 2002, did you continue to

25   send collection letters into Connecticut?

SANDERS, GALE & RUSSELL                    (203) 624-4157

Page 32

1                    MR. FIANO: I am going to object to the

2      form of that question.

3          A.   Now I don't understand.  That I think is

4      privileged.

5          Q.   I am asking about third party communications.

6          A.   No, they are not.

7          Q.   What is the roadblock that is preventing JBC

8      from getting a license in Connecticut?

9          A.   I don't know.

10                   MR. FIANO: Object to the form.

11                   THE WITNESS: Sorry.

12                   MR. FIANO: That's okay.

13         Q.   Have you personally contacted the Connecticut

14     Banking Department with regard to JBC licensing?

15         A.   No.

16         Q.   Do you have any procedures in place to prevent

17     letters from being sent, collection letters from being

18     sent, to Connecticut residents?

19         A.   I don't believe so.

20         Q.   So as far as you know, JBC is still sending

21     collection letters into Connecticut?

22                   MR. FIANO: Object to the form.  I don't

23     think he testified that they are sending letters into

24     Connecticut.  I think he just testified that they don't

25     have procedures to prevent letters being sent into

GOINS v. JBC                                    January 27, 2004

1    mailing facility, which is outsourced, and the letters

2    would be generated at that facility and sent out within

3    24 hours.

4        Q.   Is your outsource facility in Michigan?

5        A.   I think they are, yes.  I think they are in

6    Detroit or in that area.

7        Q    You said a letter would be requested for a

8    particular debtor.  Who decides what letter is

9    requested?

10       A.   Generally, I do.

11       Q.   If a letter went to Ms. Goins, you yourself

12   would decide which letter should go to her?

13       A.   We use several different techniques to

14   decide -- I use several different techniques to decide

15   which letters go to whom.  So I am not sure if I

16   answered your question, but if I haven't, you will have

17   to ask me a different question so I can be more

18   specific.

19       Q.   If JBC were sending a letter to Ms. Goins --

20       A.   So we are going to be -- we are going to now

21   hypothecate something, right?  We are going to say that

22   something exists that doesn't?

23       Q.   We are going to say, how does it get produced.

24   How do you decide which letter goes to Ms. Goins, who

25   lives in Connecticut?  What are the factors?

GOINS v. JBC                                    January 27, 2004

Page 39

1       Q.    Are those factors built into the system or is

2    it something you decide per case?

3       A.    Both.

4       Q.    Is --

5       A.    Or maybe the answer is either.

6       Q.    Are your collectors allowed to generate or

7    decide what letters go out?

8       A.    No.

9       Q.    Who other than you decides what letters go

10   out?

11      A.    No one.

12      Q.    Do you decide the -- I presume the letters

13   have variables.  Do you decide what variables go in?

14      A.    I have just named those.

15      Q.    No, into the letter itself, into the body of

16   the letter?

17      A.    Well, that would lead to a different -- I

18   think you are asking me, did I draft a letter, because

19   the variables are what they are with respect to each

20   named debtor, right?  Are you asking me did I formulate

21   the letters as to what fields should go in there?

22   Right?

23      Q.    Okay.

24      A.    The answer is yes.  I have been involved.  To

25   most of the degree, I make the final decision on what

GOINS v. JBC                                    January 27, 2004

1    letters are sent out and what they contain.

2        Q.    How many hours a week do you spend at JBC?

3        A.    Too many.

4        Q.    Which means 10, 50?  What does it mean?

5        A.    I have never really taken account.  I work

6    from my home as well as from the office as well as from

7    the various offices around the country.  So I couldn't

8    answer that question fairly.

9        Q.    Is there a person named G. Strit, S-T-R-I-T,

10   at ROA Hutton?

11       A.    Again --

12             MR. FIANO: Object to the form.

13       A.    Or the relevance, really?  I mean, come on.

14       Q.    It is a "yes" or "no" question.

15       A.    No, there is not.

16       Q.    Who uses that e-mail address?

17       A.    I don't know.  I don't know.

18       Q.    Do you have something called a Check Recovery

19   Program?

20       A.    You just went from ROA Hutton on to me in your

21   question.  Are you asking me personally?

22       Q.    I am asking JBC.  You are the president.  You

23   are the boss.  You know what goes on there.

24       A.    That is fine.  You just went from ROA Hutton

25   to "you."

SANDERS, GALE & RUSSELL                    (203) 624-4157

GOINS v. JBC

January 27, 2004

Page 50

1   them?  Is that what you are saying?

2       A.   No.  We will voluntarily return them as well.

3       Q.   What occasions would result in a voluntary

4   return to the client?

5       A.   If in my opinion, and those of others who work

6   accounts, all efforts have been exhausted.

7       Q.   Would there be occasions when an account is

8   closed but not returned?

9       A.   Not typically.

10      Q.   Who decides whether an account is returned if

11  the creditor does not ask for its return?

12      A.   Ultimately, I do.

13      Q.   Does JBC report to credit bureaus?

14      A.   Just begun to.

15      Q.   When you say "just begun," how long ago would

16  that have been?

17      A.   Months.

18      Q.   So then 2001 and 2002, you did not report to

19  credit bureaus?

20      A.   That's correct.

21           MS. FAULKNER: Can we take a break for a

22  few minutes?

23           (Recess: 11:50 to 11:55 a.m.)

24      Q.   Mr. Boyajian, Marvin Brandon described his

25  role at JBC as essentially part time and his purpose to

SANDERS, GALE & RUSSELL

(203) 624-4157

GOINS v. JBC                                    January 27, 2004

Page 51

1    respond to attorneys' calls or letters.  Would you agree

2    with that description?

3         A.    No.

4         Q.    What is his role at JBC?

5         A.    He is a full-time attorney who works flexible

6    hours.  He comes to the office at the moment when he

7    can, and he has been in the office less and less, but he

8    works -- he is available and works at home as well, so I

9    would characterize him as a full-time attorney.  He is

10   supposed to do a lot more than just respond to

11   attorneys, and I think he does.

12        Q.    What else do you think he does?

13        A.    I think he reviews accounts.  He looks at --

14   he oversees litigation and Associates' network of

15   attorneys that we use nationwide to litigate accounts.

16   He reviews FDCPA requirements and state requirements and

17   advises myself and others in the company as to what

18   compliance requirements might be.  He speaks to

19   attorneys and debtors.  He writes memos.  He

20   participates in training.  Those would be general

21   responsibilities.

22        Q.    Can you tell me, what is Attorney General

23   Carl McGraw's interest in JBC?

24        A.    Well, you will have to ask him yourself.

25              MR. FIANO: Objection to the form.

SANDERS, GALE & RUSSELL                    (203) 624-4157

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    ------------------------------x

4

EVELINE GOINS,                   :

5

         Plaintiff,              :    Civil Action

6

     -versus-                    :    3:02CV 1537 (AVC)

7

MARVIN BRANDON,                  :

8

                 Defendant.      :

9

10   ------------------------------x

11

12

13

14            Deposition of MARV BRANDON, taken

15   pursuant to the Federal Rules of Civil Procedure,

16   at the law offices of KLEBAN & SAMOR, 2425 Post

17   Road, Southport, Connecticut, before Lynn

18   Muscatello, a Notary Public in and for the State

19   of Connecticut on September 5, 2003, at 1:12 p.m.

20

21

22

23

24

25

1    outside of the firm.

2        Q.  Do you have a firm name?

3        A.  No.  I use my own name.  My own

4    letterhead.

5        Q.  Where were you admitted to practice?

6        A.  I'm admitted to practice in New Jersey,

7    Florida, and New York.

8        Q.  Is Mr. Boyajian an attorney?

9        A.  Yes.

10       Q.  Do you know where he went to law school?

11       A.  I believe he went to Rutgers.

12       Q.  When did he became an attorney?

13       A.  I don't know the date.

14       Q.  Five years ago, two years ago, do you

15   have any idea?

16       A.  It would be, on speculating, two or

17   three, three years ago at least.

18       Q.  And where is he admitted to practice?

19       A.  California.

20       Q.  So you think he's been admitted to

21   practice from California for a couple of years?

22       A.  Yes.

23       Q.  JBC and Associates has an office in

24   California?

25       A.  Yes.

1        Q.   Are you there all day everyday?

2        A.   No.

3        Q.   What are your hours?

4        A.   Nine to five thirty usually.

5        Q.   Is that Monday through Friday?

6        A.   No.   At present I'm only working three

7    days a week.

8        Q.   Which three days?

9        A.   It depends.   It varies; let's put it that

10   way.   That's the best answer I can give.   It

11   depends on whether I have to go to court or not.

12   Convenience of the firm, my convenience.   So it

13   varies from week to week.

14       Q.   What would be a typical day for you at

15   the office?

16       A.   I'm responsible for handling letters from

17   attorneys concerning collection of debt.   Letters

18   and faxes that come in, I respond to them.

19   Whenever an attorney calls, the call is sent to

20   me.   So I respond to attorneys legally.

21       Q.   Are you responding to people who are

22   collecting for JBC, or are you responding to

23   opposing attorneys or both?

24       A.   Opposing attorneys.   Sometimes when

25   attorneys are collecting for us and they have a

1          A.   That's correct.

2          Q.   Then you make the phone call?

3          A.   Yes.

4          Q.   And are you able to read the consumer's

5     records on your computer screen?

6          A.   Yes.   The information we have on the

7     file.  I bring the file up.

8          Q.   And are you able to enter information

9     into that computer record?

10         A.   Yes.

11         Q.   What type of information could you enter?

12         A.   I would, if the phone call was important,

13    I would enter what the phone call was about.

14         Q.   Would you enter the date and time or is

15    that all?

16         A.   The computer does that automatically.

17         Q.   Would you enter your name or initials?

18         A.   No.   The computer does that.

19         Q.   So the computer knows what terminal is

20    entering the information automatically; is that

21    correct?

22         A.   I believe so, yes.

23         Q.   Do you personally ever decide to send

24    letters to debtors?

25         A.   Well, are we talking about collection

1   letters?

2         Q.   Yes.

3         A.   Usually Jack Boyajian makes that

4    decision.   He reviews the accounts.

5         Q.   How many accounts would you have in your

6    office at any given time?

7         A.   I have no idea.   I couldn't even

8    speculate on that.

9         Q.   If you have a hundred collectors how many

10   accounts on average would they be working; do you

11   know?

12        A.   I have no knowledge of the number of

13   accounts or number of accounts that a collector

14   would have.

15        Q.   If you entered this information on the

16   screen and saw that a letter should go out to

17   somebody, perhaps to the attorney, do you have

18   that authority to create such a letter?

19        A.   If I'm corresponding with an attorney,

20   yes.   I usually deal with the attorneys.

21        Q.   So you don't have to go to Mr. Boyajian

22   for review, can I send this letter out to attorney

23   so and so?

24        A.   It would be very unusual.

25        Q.   What is the process to print out a

1    letter?

2                    (Discussion off the record.)

3        A.   You just get into Micro Soft Word and

4    type in a letter, or I have Karen Hopkins print it

5    for me.

6        Q.   So it goes directly out of your own

7    office?

8        A.   Or I give it to Karen, and she prints

9    it.  I sign it, and she sends it.

10       Q.   Now, with regard to the form collection

11   letters, how do those go out?

12       A.   I'm not too familiar with the process,

13   but the information comes in from the clients.

14   And Jack Boyajian would review it.  And he would

15   determine if we have sufficient information and if

16   the account is -- what letter should be sent to

17   the debtor.  He makes that determination

18   firsthand.  And the letter is sent out if we have

19   enough information and if we verified the

20   information as to where the debtor lives, how much

21   is the amount, we have sufficient back-up

22   information.  And he would make that determination

23   usually.

24       Q.   So he would sit at the computer screen

25   and push the buttons to have a letter generated?

1          A.   Yes.   Initially he reviews it, yes.

2          Q.   But he doesn't send out every letter?

3          A.   I don't know.   I've never done it with

4     him.

5          Q.   Does a collector have authority to send

6     out a letter?

7          A.   To my knowledge, no.

8          Q.   Are letters sent out on an automatic time

9     basis?

10         A.   I'm not familiar with the process of how

11    it's actually done.

12         Q.   You yourself don't review any of the

13    letters that are sent to debtors; is that correct?

14         A.   That's correct.   Mr. Boyajian reviews

15    them.

16         Q.   Your letters are printed in Michigan; how

17    does that process take place?

18         A.   I don't know.   I would assume that the

19    information is given to the printer by computer

20    tape or disk.

21         Q.   Does JBC have form letters with

22    fill-in-the-blank variables?

23         A.   I can't comment on that.   I don't know.

24         Q.   Is it something Mr. Boyajian would know?

25         A.   I assume, yes.

1  or that's a twenty dollar fee that we may be

2  entitled to.

3      Q.  Do you know whether your office adds the

4  twenty dollars or whether it's already added when

5  you get the account?

6      A.  Oh, I believe we add it.

7      Q.  Your office adds the twenty dollars?

8      A.  I believe so.

9      Q.  The second sentence says if you do not

10  make payment you may be sued to recover payment.

11  It looks like the total amount here is a hundred

12  thirty-five dollars and sixty-three cents.  Has

13  Mr. Boyajian made the decision to sue when this

14  letter goes to the consumer?

15      A.  Has he made -- I'm sorry.  Your question

16  is has he made the decision at the time?  I don't

17  know.  I can't comment on what his decision is.

18      Q.  Well, your signature is on the letter.

19  And you have made a statement of fact that if you

20  do not make payment you may be sued to recover

21  payment.  Do you intend to sue when that letter

22  goes out?

23      A.  Which sentence are you alluding to?

24      Q.  The second sentence, if you do not make

25  payment, second sentence in the middle paragraph?

1        A.    (No audible response.)

2        Q.    This is a very long pause.   Is there

3    something wrong?

4        A.    No.   It's up to Mr. Boyajian whether he

5    wants to sue or not.

6        Q.    Okay.   So when this letter goes out under

7    your letterhead you don't have any intent to sue;

8    is that correct?   That's a yes or no.

9        A.    Do I have the intent to sue?   The answer

10    would be no.

11        Q.    Let's look at the third sentence.   If a

12    judgment is rendered against you in court it may

13    not only include the original face amount but

14    additional damages.   It goes on to mention

15    additional damages.   What is the basis for your

16    statement that additional damages could be

17    entered?

18        A.    I would have to see the statute, 52565A.

19        Q.    When you send that letter out are you

20    aware whether the creditor has sent out a written

21    demand for payment to the consumer?

22        A.    I have no knowledge of whether the

23    creditor sent out a demand for payment or not.

24        Q.    Do you know whether the creditor has a

25    posting at his place of employment about bounced

1    letter was drafted for Connecticut?

2        A.  Yes.

3        Q.  And what is the basis for your advising

4    the debtor that he or she may be subject to

5    statutory penalties?

6        A.  The terms of the statute.

7        Q.  And what do the terms of the stature

8    provide with regard to statutory penalties?

9        A.  Offhand I don't know the Connecticut

10    General Statute section.

11        Q.  You're not admitted as an attorney in

12    Connecticut?

13        A.  I am not.

14                (Plaintiff's Exhibit D entered for

15    identification:  A three-page defendant's response

16    to first set of interrogatories; Plaintiff's

17    Exhibit E entered for identification: A three-page

18    fact sheet.)

19        Q.  Turning to Plaintiff's Exhibit D, and I'm

20    going to ask you to look at D and E together

21    because they both relate to the Marshalls'

22    account.

23        A.  Yes.

24        Q.  According to Exhibit D, there were I

25    believe seven checks issued to Marshalls in

1    January of 1996; is that correct?

2        A.   Yes.

3        Q.   And I won't ask you to add them up.   I'll

4    represent they amount to two thousand one hundred

5    and ninety-five dollars and fifty-four cents.

6        A.   Face amount?

7        Q.   Right.   What figure would be appropriate

8    to send in a letter to Miss Goins that you would

9    demand in your letter when you're collecting seven

10   checks totalling two thousand one hundred

11   ninety-five dollars?

12       A.   Which letter?

13       Q.   Any letter.

14       A.   The first letter, face amount plus twenty

15   dollar check fee.

16       Q.   For each check?

17       A.   Yes.

18       Q.   Is there some difference in the second

19   letter as to the amount that would be demanded?

20       A.   I don't know what the demand amount would

21   be in the second letter.

22       Q.   Would it change?

23       A.   I don't know.

24       Q.   Is there a basis for increasing the

25   demand in the second letter?

1          A.   I would have to see the statute.

2          Q.   Who inserts the amount demanded in the

3     letters?

4          A.   I assume it's computed by Jack Boyajian.

5          Q.   Would you assume that the computer

6     calculates the amount, or are you assuming that

7     someone is physically putting in an amount?

8          A.   I assume it's programmed in.

9          Q.   Let's take a look at Plaintiff's Exhibit

10    E, which is the fact sheet that goes with the

11    Marshalls' checks.  And I only reproduced the fact

12    sheet for the first check because they're all

13    pretty much alike.

14              Do you see an entry by you anywhere in

15    those three pages?

16         A.   No.

17         Q.   If you look at the top of the second

18    page, down about six lines, there is an MB?

19         A.   Oh, wait a minute.  Let me see.  Where

20    are we, second page?

21         Q.   Yes.

22         A.   Where do you see an MB?

23         Q.   62402 at 1102 about five or six lines

24    down from the top on the right-hand side on page

25    two.

1    A.   The only employee who would work for that

2    firm that I know of is Jack Boyajian, but I'm not

3    sure what the relationship is.   And anything I say

4    about it would be speculation.

5    Q.   Is there a reason that the Roa Hutton fax

6    was used instead of the JBC fax for that

7    particular piece of paper?

8    A.   Yes.   Their office is next to mine, and I

9    probably just walked in and used their fax because

10   the other fax was tied up.   That's the only

11   reason.   I use that frequently.   It's right next

12   door.

13   Q.   With regard to Ms. Goins, do you have the

14   original checks?

15   A.   I requested the original checks from the

16   clients.   Were you provided with checks?

17   Q.   No.

18           THE WITNESS:   Do you have any

19   checks?

20   Q.   Excuse me.   You're not supposed to talk

21   to Mr. Fiano.

22   A.   I requested the checks from the clients.

23   They were unable to provide checks.   As far as I

24   know there may have been two or three checks that

25   they did provide, copies of them.   If we had them

1    in the file, we would be glad to provide them to

2    you.   The majority of the checks are unavailable.

3    They were destroyed, lost, or we could not get

4    them from the clients.

5        Q.   Could you bring a civil proceeding

6    against Ms. Goins without the checks?

7        A.   We would rely on the books and records of

8    the company of the clients.

9        Q.   What books and records?

10       A.   The factual material.

11       Q.   What factual material?

12       A.   Computer, fact sheet.

13       Q.   You would bring this fact sheet into

14   court that doesn't have the dates of the checks or

15   the numbers of the checks; is that what you're

16   saying?

17       A.   I don't know if the court would accept

18   it, but we would have the information.   We would

19   provide all the information that we would have.

20   The client may have a way of printing it out,

21   their books and records.

22       Q.   And who is the client in this case?

23       A.   It would be Wilson Suede and/or

24   Marshalls.

25       Q.   Which client did you ask for the checks

1    from?

2        A.   I think we asked Melville for copies of

3    the checks, which is Marshalls and CVS if my

4    memory serves me right.

5        Q.   When did you ask for the checks?

6        A.   I asked for the checks I think as soon as

7    suit was, your first suit was commenced.

8        Q.   Do you have a copy of the letter?

9        A.   I think I did it by phone or fax, but

10   I'll look in the file and see.

11       Q.   Would that be on part of the computer

12   record that's not been provided to me so far?

13       A.   No.   If it was entered, if I entered it

14   into the computer it would have showed up on the

15   fact sheet.

16       Q.   If you would look at Exhibit H, CVS

17   assignment?

18       A.   Yes.

19       Q.   Do you recognize that document?

20       A.   Yes.

21       Q.   And what is that?

22       A.   It's an assignment of CVS' claims to JBC

23   and Associates, Inc.

24       Q.   Is that your signature on the bottom

25   left-hand side?